# United States District Court, Northern District of Illinois

JS-6

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3850 | **DATE** | 8/14/2001 |
| **CASE TITLE** | Joseph J. Nitz vs. Larry G. Massanari | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court grants the Commissioner's motion for summary judgment [doc. # 18] and denies Mr. Nitz's motion for reversal and/or remand [doc. # 8] pursuant to Sentence 4, 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter a final judgment pursuant to Fed.R.Civ.P. 58. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | number of notices | | 20 |
| | No notices required. | AUG 1 5 2001 | | |
| ✓ | Notices mailed by judge's staff. | date docketed | | |
| | Notified counsel by telephone. | docketing deputy initials | | |
| | Docketing to mail notices. | 8/14/2001 | | |
| | Mail AO 450 form. | date mailed notice | | |
| | Copy to judge/magistrate judge. | | | |
| JJK | courtroom deputy's initials | FILED FOR DOCKETING 01 AUG 14 PM 4: 59 | JJK mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DISTRICT

JOSEPH J. NITZ,                               )
                                              )
    Plaintiff,                     )
                                              )
    vs.                            )   No. 00 C 3850
                                              )
LARRY G. MASSANARI,[1]                        )   Magistrate Judge Schenkier
Commissioner of Social Security,              )
                                              )
    Defendant.                     )

DOCKETED

AUG 1 5 2001

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Joseph J. Nitz ("Mr. Nitz"), seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3). Mr. Nitz seeks summary judgment reversing the Commissioner's decision denying his claim for SSI and DIB or, in the alternative, remanding the case to the Commissioner for further proceedings (doc. # 8). The Commissioner, for his part, has moved for summary judgment affirming the decision (doc. # 18). For the reasons set forth below, the Court grants the Commissioner's motion for summary judgment, and denies Mr. Nitz's alternative motion for summary judgment.

---

[1] Larry G. Massanari, the Acting Commissioner of Social Security, is substituted as defendant in place of William A. Halter, the former Commissioner, pursuant to Fed.R.Civ.P. 25(d)(1).

[2] By the parties' consent, on January 9, 2001 , this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment. (doc. ## 13-15).

## A.    Procedural History.

On March 3, 1997, Mr. Nitz filed an application for SSI and DIB benefits, alleging that he had been disabled since December 31, 1990 due to blindness in the left eye, severe headaches, vertigo, and partial vision in the right eye (R. 183-84).[3]  That application was denied by the Social Security Administration ("SSA") on June 19, 1997 (R. 27-30, R. 185-88), and a request for reconsideration was denied on July 31, 1997 (R. 31-34, 190-92).  A request for a hearing was filed on September 24, 1997 (R. 35).  On March 2, 1998, Mr. Nitz appeared with counsel, along with a Vocational Expert ("VE"), for a hearing before an Administrative Law Judge ("ALJ"). The ALJ issued a written decision on February 26, 1999, denying Mr. Nitz' claim for SSI and DIB (R. 11-20).  The Appeals Council, considering new evidence submitted by Mr. Nitz's attorney which included a diagnosis of Meniere's disease (R. 193-95),[4] denied review of the ALJ's decision on April 21, 2000 (R. 4-5), thereby rendering the ALJ's decision the Commissioner's final decision and subject to judicial review by the district court. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 416.1481.  Mr. Nitz then filed a timely complaint to this Court.

## B.    Factual Background.

Mr. Nitz was born on December 26, 1957, and was thirty-nine years old when he appeared before the ALJ (R. 228).  Mr. Nitz is 6 feet and 1 inch tall and weighed 180 pounds,

---

[3]The record is inconsistent, both by Mr. Nitz's account and that of the medical experts, as to the eye in which Mr. Nitz has a loss of vision.  Multiple references in the record point to Mr. Nitz's left eye blindness (R. 16, 18, 70, 185); however, there is also documentation that Mr. Nitz has the visual loss in his right eye (R. 55-56, 144, 175, 224-25). For purposes of this Court's discussion, we will refer to the left eye as the one in which Mr. Nitz is considered legally blind, since that it what was indicated in Mr. Nitz's SSI application (R. 185).  Regardless, there is no prejudicial error as to the claimant's disability claims because both parties agree that Mr. Nitz is legally blind in one eye, but has vision out of the other.

[4]"Meniere's disease" is defined as a "chronic disease of the inner ear with recurrent episodes of vertigo, progressive unilateral nerve deafness and tinnitus (which is a sensation of noise – such as ringing – within the ear)." *See* MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY at 740 (3rd Ed. 1990).

having lost approximately 30 pounds over the last five years, prior to the administrative hearing (R. 229). Mr. Nitz is unmarried, has no children, and lives in a house with his mother and sister (R. 229, 240). Currently, Mr. Nitz does not have any income (R. 247). Since Mr. Nitz had eye surgery at age five to correct being "cross eyed," he has not been hospitalized overnight, nor has he been seriously ill (R. 144-145).

For the past six years, Mr. Nitz has not driven a car because he felt he "would be a danger to [himself] and those that are around [him]" (R. 241). His daily routine consists of mostly listening to educational audiotapes (R. 241). The furthest distance Mr. Nitz has walked in the last two years is two blocks (R. 241). According to Mr. Nitz, these walks usually occur at night or on very cloudy days, in order to avoid the sunlight (R. 242), because he reported that his seeing eye is sensitive to light and excessive light triggers his headaches (R. 144, 224). Mr. Nitz also reported that he does not use public transportation, does not go to church, cannot watch television or go to the movies, and does not help with household chores (R. 242). Occasionally, he plays the guitar and will go to visit friends when they come to pick him up (R. 242-43). Mr. Nitz smokes one pack of cigarettes per day (R. 243). In March 1995, Mr. Nitz also applied for SSI and DIB due to "blindness in [his] right eye, limited vision in [his] left eye and severe headaches" ("1995 Claim") (R. 51). The 1995 claim was denied, but Mr. Nitz never appealed this prior decision (R. 47, 251).

*1.    Mr. Nitz's Work History.*

Mr. Nitz has a GED and has worked various jobs in the past. From 1978-1981, Mr. Nitz worked as a maintenance person for a clothing store, doing odd jobs such as painting stock and changing lightbulbs (R. 231). At times during 1983-1986, and again in 1995, Mr. Nitz worked forty hours per week as a maintenance worker at an elementary school, cleaning classrooms,

repairing broken windows and playground equipment, and polishing and buffing the hallways (R. 234-35, 250-51).[5] From 1986-1987, Mr. Nitz worked as a "cash custodian" in the mailroom of an insurance agency, calculating the money received from customers' premium payments, sorting incoming and outgoing mail, and delivering the mail bags to a lower level of the office for pick up by the post office (R. 232-33).

2. *Mr. Nitz's Medical History.*

Mr. Nitz alleges that his medical problems are long-standing and stem from corrective eye surgery, which he had at age five (R. 224). Mr. Nitz reports that he is legally blind in the left eye as a result of this surgery (R. 144, 230), but he has near normal acuity in his right eye (R. 109, 175). In addition, Mr. Nitz stated that since the eye surgery, he has had problems with migraine type headaches due to eye strain and/or an extreme sensitivity to flourescent lights (R. 144, 174, 224), and he currently wears protective sun shades at all times to reduce light glare (R. 241). Mr. Nitz reports that the gaps in his employment were due to these migraines, and he feels he lost various jobs because of absences caused by the headaches (R. 235). However, Mr. Nitz notes that at the time he lost these jobs, he did not inform his supervisors that his absences were due to migraines (R. 237, 248-49); instead, he told them that he had the flu or dental appointments, because he felt his supervisors would not think he was "an asset to the company" if he left work due to the headaches (R. 237).

---

[5]During his testimony, Mr. Nitz reported that between 1983-1986 and 1995-1996, there were "two summers that [he] worked ... and then one [full] year during that period" during which he did maintenance work at the elementary school. He was not able to pinpoint which of these years he was employed for the full year, but maintained that the reason he only worked summers during that period was because "that's all that was open" (R. 234-35). When asked by the ALJ to clarify which years he worked full-time and which years he worked only during the summer, Mr. Nitz replied that he last worked during the summer of 1995 in this position (R. 235).

4

Mr. Nitz stated that his migraines became worse in severity and frequency as he got older (R. 237), occurring two to three times per day, each lasting two to three hours long (R. 236). Mr. Nitz testified: "It (the migraines) first starts off with the pressure, and then I get the white lights, the flashing white light ... and then the migraines would start ... and after that, there's a state of confusion and disorientation" (R. 236). Although he relates that he had suffered from migraines since his surgery in 1962 or 1963 (when he was five years old), Mr. Nitz did not seek treatment for migraines until 1997, when he went to the Catherine McCauley Clinic ("the Clinic"), a free clinic in Hamden, Illinois (R. 224). At the Clinic, he received various medications that initially did not alleviate the symptoms; but, Mr. Nitz now reports that since he started taking Depakote, his migraines, although similar in intensity and duration, occur less frequently overall or only about five to six times per week (R. 236, 248).

In addition, Mr. Nitz reported that he has suffered from vertigo since June of 1997 (R. 243).[6] Mr. Nitz testified at the administrative hearing that the dizziness sometimes forced him to "fall over to [his] side," and occurred almost daily (R. 244). His doctors have prescribed Antivert which, according to Mr. Nitz, "that seems like it does [combat the vertigo] pretty good."

3.   *Medical Evidence.*

On November 28, 1994, Mr. Nitz had an ophthalmologic exam associated with his 1995 claim, which did not mention migraines or vertigo, but did note abnormalities in Mr. Nitz's visual fields, legal blindness in one eye, and 20/30-20/25 vision in the other eye. However, the report concluded that no work-related activities were affected by those findings (R. 55-56).

Mr. Nitz sought emergency medical care at Saint Margaret Mercy Hospital ("Mercy Hospital") on August 16, 1994 and November 2, 1994 for a bee sting (R. 128-135), and on

---

[6] "Vertigo" is defined as "a sense of faintness or inability to maintain normal balance in a standing or seated position." *See* MOSBY'S MEDICAL, NURSING AND ALLIED HEALTH DICTIONARY at 1233 (3rd Ed. 1990).

August 24, 1995, for a "laceration to his left foot" (R. 121-24). These hospital records do not indicate complaints of migraines or vertigo by Mr. Nitz (R. 121-135). On February 9, 1997, Mr. Nitz went to Mercy Hospital complaining of dizziness only when he changed position, but, according to the records, Mr. Nitz denied any headaches (R. 119-20). He was placed on the medication Antivert, and discharged the same day (R. 119).

On April 10, 1997, Dr. Quinones performed an ophthalmologic exam ("Quinones exam") (R. 140-42), which found that Mr. Nitz suffered from amblyopia[7] and early presbyopia.[8] This examination – about one month after Mr. Nitz filed his application for SSI and DIB – contains the first report of migraine headaches. Dr. Quinones reported that Mr. Nitz complained of "eye stress" and migraines, which were worse in the sunlight and occurred 2 to 3 times per day, with associated confusion after the migraines (R. 140). Dr. Quinones found that Mr. Nitz's monocular vision was "sufficient for most distance and near tasks associated with most types of employment," but further concluded that Mr. Nitz "was not suitable for such tasks that rely on good stereopsis"[9] (R. 141). Dr. Quinones suggested protective safety glasses, and referred Mr. Nitz to an internist or neurologist to address his migraine complaints (R. 141).

On April 12, 1997, Dr. Rogers, a psychologist, evaluated Mr. Nitz at the request of the SSA. Dr. Rogers reported that Mr. Nitz was "overly concerned about matters of physical well being" (R. 138). Dr. Rogers concluded that Mr. Nitz had no trouble in sensorium, memory or intellectual resources (R. 138-39).

---

[7]"Amblyopia" is defined as "reduced vision in an eye that appears to be structurally normal." *Id.*

[8]"Presbyopia" is defined as " far-sightedness resulting from a loss of elasticity of the lens of the eye." *Id.* at 960.

[9]"Stereopsis" is defined as "the quality of visual fusion." *Id.* at 116.

On April 18, 1997, at the request of the SSA, Mr. Nitz was examined by Dr. Gerhold ("Gerhold" exam"), a consulting internist (R. 144-46). Dr. Gerhold noted that Mr. Nitz indicated that his headaches were triggered by reading, watching television, or being exposed to flourescent lights (R. 144). Mr. Nitz stated that he took aspirin for his "severe headaches," which "improved [the headaches] somewhat," and that he continued to take Antivert for his vertigo. Dr. Gerhold also reported that Mr. Nitz had a CT scan of the brain that did not reveal any abnormalities. His impression was that Mr. Nitz "experiences what looks like cluster type headaches with aura in the left eye ... [o]therwise, the physical examination is normal" (R. 146).

A vocational assessment was completed on June 2, 1997, with the conclusion that "there is no indication of an exertional restriction," but that Mr. Nitz could not be expected to work at unprotected heights or around hazardous equipment due to his history of vertigo and his visual deficits (R. 109).

Medical records from the McCauley Clinic ("the Clinic") indicate that Mr. Nitz first sought treatment for migraines on September 17, 1997 (R. 197). He was discharged from the clinic and prescribed Tiazac and Midrin. Mr. Nitz returned to the Clinic on October 15, 1997, because he had an allergic reaction to these medications. He then began taking Meclizine for his vertigo and Depakote for the migraines. On November 19, 1997, Mr. Nitz again returned to the Clinic, reporting that the headaches were "much improved," but that he was still dizzy because he had not taken his Meclizine on that particular day (R. 198). On December 17, 1997, Mr. Nitz returned for a follow-up visit, stating that his migraines were decreasing in frequency (R. 199). The physician increased his Depakote to three times per day and added Antivert for his continued complaints of dizziness. On February 11, 1998, the Clinic notes indicated that Mr. Nitz "states [the] migraines occur less frequently" (R. 198), and upon his return on February 18,

1998, Mr. Nitz noted that his migraines occurred 4-5 times per week. At that time, Allegra was added to his medication regimen for the migraines.

Dr. Brannegan, a neurologist, examined Mr. Nitz on November 25, 1998 (R. 174-75). During his exam, Dr. Brannegan noted Mr. Nitz's complaints of a "severe sensitivity to light" which preceded his headaches. Dr. Brannegan also noted how Mr. Nitz's use of Depakote had decreased the frequency of those headaches (R. 174). He stated that Mr. Nitz used Aspirin for the head pain (R. 174). Further, the doctor noted that Mr. Nitz was seen by several doctors at Johns Hopkins University and the University of Chicago "in an effort to explain the visual loss in his [one] eye and the sensitivity to light and strain ... [but] no conclusion or consensus as to what the mechanism is for that problem" had been found (R. 174). His impression was that Mr. Nitz had frequent migraine type headaches; however, his neurologic exam was essentially normal except for the visual loss in his one eye (R. 175). In addition, Dr. Brannegan noted that "the patient (Mr. Nitz) also has problems with his balance, although I could not demonstrate abnormal physical signs for this problem" (R. 175).

4.    *The Vocational Expert's Testimony.*

Mr. Edward Pagella, a Vocational Expert ("VE"), testified on March 3, 1998, during the administrative hearing. The VE testified that Mr. Nitz's job as a mail room clerk was "low end semi-skilled at the light level of physical tolerance as performed in the national economy" (R. 255). In addition, the VE found that Mr. Nitz's job as a maintenance worker was at the low end of the semi-skilled, medium level of physical tolerance (R. 255). The VE testified that he believed there were a significant number of jobs in the national economy as a laundry worker, a packer, and a bagger, considering the ALJ's hypothetical ("hypothetical 1") of a person 40 years of age, with a GED education, medium work function, the loss of vision in one eye and 20/30

vision in the other, and a requirement for low stress, low degree of concentration, and no exposure to working at heights or around moving machinery (R. 256-57).

When asked to further opine what jobs were available with the addition of the limitation that the job not require extensive reading or close vision work ("hypothetical 2"), the VE testified that the same jobs would apply (R. 257). In hypothetical number three, the ALJ asked the VE to address the availability of light work with the same restrictions as hypotheticals 1 and 2. The VE testified that under those limitations a significant number of jobs (8,000) existed as a locker room attendant, check room attendant, and car wash attendant (R. 257). Hypothetical number 4 added the limitation that the work must be sedentary, and the VE said there would be some 7,000 jobs available (R. 258).

Finally, the ALJ asked the VE to address whether adding the restriction of dim lighting and inability to concentrate for more than 30 minutes would affect the availability of work. The VE answered that it would, but there still would be a significant number of jobs that Mr. Nitz could perform (such as, the job of a check room attendant) (R. 258-59). On examination by Mr. Nitz's attorney, the VE said that if a person suffered very intense migraine headaches five to six times a week that lasted for up to two hours, required him to lay down and rendered him disoriented, that would preclude any type of "substantial gainful activity" (R. 259-60).

## C.     The ALJ's Decision.

The ALJ applied the sequential five-step test for determining whether a claimant is disabled as outlined in 20 C.F.R. § 404.1520 (1998). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity;

(4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. See 20 C.F.R. § 404.1520 (1998). A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step (other than Step 3) precludes a finding of disability. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citing *Zalewski v. Heckler*, 760 F.2d 160, 162 n. Z (7th Cir. 1985)). The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* The ALJ's analysis at Step 5 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work and the availability of such work in the national economy.

At Step 1, the ALJ determined that Mr. Nitz had not engaged in any substantial gainful activity since 1995 (R. 15). The ALJ next established that Mr. Nitz's blindness in the one eye, his migraine headaches and his vertigo were severe, under the definition established by the SSA at Step 2. At Step 3, the ALJ concluded that Mr. Nitz's impairments, while severe, did not meet or medically equal the level of severity of any impairment as set forth in Appendix 1, Subpart P, Regulations No. 4 of the Listing of Impairments.

At Step 4, the ALJ found that Mr. Nitz had the RFC to perform a limited range of light work. Light work, as defined in the Social Security Act, involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds and can include a good deal of standing or walking, or sitting most of the time with some pushing and pulling of arm and leg controls (R. 16). The ALJ found that because of Mr. Nitz's blindness in one eye, his migraine headaches associated with bright lights and his vertigo, he was limited in the type of light work he could perform. Specifically, the ALJ found that Mr. Nitz would not be capable of

performing tasks requiring stereoscopic vision, that he could not work at heights or around machinery, and that he should be limited to work that did not require more than a low degree of concentration, reading, and stress (R. 19-20).

In determining this RFC, the ALJ found that Mr. Nitz's treatment records from the Clinic "do not disclose a pervasive frequency of migraine headaches or dizziness" (R. 16). The ALJ noted that the treatment records from the McCauley Clinic, although noting a prior visit in 1996 for treatment of his right knee, do not contain records for treatment of his migraines until September 1997 (R. 16). In addition, the ALJ cited examples of how Mr. Nitz's dizziness was relieved by Antivert and his migraines were much improved after having started Depakote (R. 16-17).

The ALJ summarized the assessments made by the State Agency medical consultants (R. 17-18), including Dr. Quinones' assessment that Mr. Nitz's "monocular visual acuity was sufficient for most distance and near tasks associated with most types of employment, but that he may not be suitable for tasks that rely on good stereopsis" (R. 17). He mentioned the psychological examiner who found that "the claimant had no trouble in sensorium, memory or intellectual resources and that he was intact as regards to mental status" (R. 17). Referring to Dr. Gerhold's exam, the ALJ remarked that Mr. Nitz "had what appeared to be cluster-type headaches, dating back to age five and occurring five to six times per week, but otherwise the physical exam was normal" (R. 17). In addition, the ALJ referenced Dr. Brannegan's conclusions, which found migraine type headaches which occurred five to six times per week, but, he also noted that the exam was essentially normal except for Mr. Nitz's loss of vision in the one eye (R. 17).

The ALJ further explained in his written decision that he found Mr. Nitz's testimony concerning his symptoms to be "exaggerated...and not fully credible" (R. 17). To substantiate this finding, the ALJ pointed out that there was no objective medical evidence of headaches. The ALJ's written decision also points to the inconsistency between Mr. Nitz's allegations that he had intractable migraine headaches since the age of five (which would have been 1962 or 1963), and the failure of any efforts to obtain treatment for this prior to September 1997 (R. 18). In addition, the ALJ referred to the medical records of February, 1997 where Mr. Nitz mentions his dizziness, and stated that the dizziness was relieved with the Antivert, but denied having any headaches (R. 18). Finally, the ALJ points to evidence of Mr. Nitz reporting that his migraines were diminished by taking Depakote (R. 18).

Based on these findings, the ALJ concluded that Mr. Nitz had the RFC to perform a limited range of light work. At Step 4, the ALJ found that Mr. Nitz was unable to perform the type of work he performed in the past as a maintenance worker, which he deemed required medium physical exertion (R. 18, 20).

Therefore, the ALJ was required at Step 5 to determine if Mr. Nitz was able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520. The ALJ considered Mr. Nitz's age, GED, and semi-skilled past work. The ALJ also cited the VE's identification of a significant number of jobs that Mr. Nitz could perform: jobs which were light in exertion, would not require stereoscopic vision, would not involve working at heights or around machinery, and would involve both low stress and a low degree of concentration (R. 19-20).

Having applied the five-step analysis, the ALJ concluded that Mr. Nitz failed to meet the test of disability as defined in the Social Security Act and was not eligible for DIB or SSI.

## II.

Judicial review of the Commissioner's (here the ALJ's) decision is governed by 42 U.S.C. § 405(g), which states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (7th Cir. 1971). The Court cannot "decide facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the Commissioner. *Herron v. Shalala*, 19 F. 3d 329, 333 (7th Cir. 1994). If the record contains substantial evidence to support the ALJ's findings, the reviewing court must affirm, unless there has been an error of law. *Erhart v. Secretary of Health and Human Services,* 969 F. 2d 534, 538 (7th Cir. 1992).

Although deference is afforded an ALJ, the ultimate decision "must be based upon a fair and impartial presentation of all the medical evidence that is credible [and] supported by clinical findings." *Taylor v. Schweiker,* 739 F. 2d 1240, 1243 (7th Cir. 1984) (ALJ failed to address two relevant reports by two physicians and gave no reason for the omission, and case remanded). The ALJ is not required to address every piece of evidence in the record, but meaningful appellate review requires that the ALJ articulate reasons for rejecting certain facts that may not support the ALJ's finding and why that evidence is less convincing. See generally *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

## III.

The ALJ relied on the testimony of the VE to satisfy the Commissioner's burden of proof at Step 5 to establish the existence of a significant number of jobs in the national economy that a person with Mr. Nitz's RFC could perform. Within the five hypotheticals posed to the VE (R.

254-59), the ALJ asked questions regarding medium to light to sedentary work. In addition, besides the exertional limitations accounted for in the hypotheticals, the ALJ gave examples of non-exertional limitations that Mr. Nitz's medical history would support. The ALJ, although finding Mr. Nitz's allegations of migraines to be not fully credible, used Mr. Nitz's testimony about what triggered his migraines (R. 238-43), and included those factors in the hypotheticals posed to the VE. The ALJ's conclusion, based on the VE's testimony, was that there were a significant number of jobs, which existed in the local economy, including the Chicago area and the counties of Lake and Porter, Indiana (R. 20).

Mr. Nitz contends that the hypothetical questions posed to the VE did not include the entire scope of Mr. Nitz's limitations; notably, his "severe, incapacitating migraine headaches" (Pl. Mem. at 6). In addition, Mr. Nitz maintains that the ALJ's credibility determination is not supported by substantial evidence, as outlined in Social Security Ruling 96-7p ("SSR 96-7p") (Pl. Mem. at 9). Finally, Mr. Nitz argues that the Appeals Council erred by not vacating the ALJ's decision after additional evidence, which included a new diagnosis of Meniere's disease, was submitted (Pl. Mem. at 12). The Court discusses, and rejects, each of these contentions in turn.

## A.

Mr. Nitz attacks the Commissioner's findings, on the ground that none of the ALJ's hypotheticals to the VE include Mr. Nitz's "severe, incapacitating migraine headaches, which are so frequent and so severe as to preclude any work-like activity while they are occurring" (Pl. Mem. at 6). However, this argument fails because the ALJ's determination did not discount those allegations. To the contrary, the ALJ considered those factors which Mr. Nitz himself

14

reported were the circumstances that triggered his headaches, and built into his hypotheticals to the VE job limitations that would not expose Mr. Nitz to those conditions.

The ALJ's third hypothetical assumed a light duty position, with the limitation of low concentration, low stress, and no extensive reading or close vision work (to deal with the migraines), and no exposure to heights or moving machinery (to deal with vertigo). The VE stated that with those limitations, Mr. Nitz could perform 8,000 jobs available in the relevant area (R. 256-57). Even when adding the limitations of sedentary work, no more than 30 minutes of continuous concentration and dim lighting (hypothetical numbers), the VE stated that there would be work that Mr. Nitz could perform that exists in significant numbers in the national economy – such as that of a check room attendant (R. 259). The VE's testimony regarding the type and number of jobs available is relevant evidence that a reasonable mind would accept as adequate to support the ALJ's conclusion that there exists a significant number of jobs that Mr. Nitz had an RFC to perform. *See generally, Schmidt v. Apfel*, 201 F.3d 970, 973 (VE's testimony that characteristics of the claimant were highly marketable, was consistent with the evidence, and was therefore substantial evidence on which the ALJ was entitled to rely).

Mr. Nitz does not challenge the accuracy of the VE's testimony based on the hypotheticals posed by the ALJ, but argues instead that the ALJ posed the wrong hypothetical (Pl. Mem. 6-8). Mr. Nitz argues that the VE testimony on which the ALJ should have relied was the answer, in response to Mr. Nitz's hypothetical, that there was no work he could perform if he were afflicted with intense migraines five to six times a week that incapacitated him for two hours or so each time they occurred (R. 259-60). However, even assuming the credibility of Mr. Nitz's testimony concerning the frequency and intensity of the headaches, the ALJ accounted for

that evidence by posing hypotheticals that removed from the pool of jobs considered the conditions that – according to Mr. Nitz's own testimony – triggered his headaches.

The ALJ did not err in relying on the VE's testimony concerning available jobs that Mr. Nitz can perform.

## B.

Mr. Nitz also challenges the ALJ's finding that "[i]n reaching my conclusions about the claimant's residual functional capacity, I have considered the effects of the claimant's allegations and testimony with regard to alleged symptoms and physical limitations, but I found his testimony to be exaggerated from the medical evidence and not fully credible" (R. 18). Had the ALJ's finding ended here, the Court would remand in order for the ALJ to clarify why he felt Mr. Nitz's testimony was "exaggerated" and why it was not fully credible. *See generally Zurawski,* 245 F.3d at 887 (the ALJ's decision "must contain specific reasons for [his] findings on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000) (ALJ must articulate at some minimal level the analysis of the evidence to permit accurate review); *see also Sarchet v. Chater,* 78 F.3d 305, 308 (7th Cir. 1996) (decision of the ALJ to deny DIB benefits remanded in order for ALJ to fully articulate his reasons for finding that claimant's testimony was "melodramatic"); *Zurawski,* 245 F.3d at 887 (decision of lower court to deny benefits remanded in order for ALJ to explain why the ALJ concluded that claimant's testimony was "inconsistent").

However, here the ALJ sufficiently explained his credibility determination. The ALJ explained that the only evidence of migraines was Mr. Nitz's reports to various doctors. The ALJ noted that Mr. Nitz's assertions of intractable migraines going back to 1962 or 1963, when he was five years old, did not rest comfortably with the failure of Mr. Nitz to seek medical attention for that problem until September 1997 – or with his denial of headaches during treatment he received in February 1997. The ALJ also discussed the fact that despite his testimony about continuing severe headaches, Mr. Nitz's doctor reports show the migraines to be diminished with medication (R. 18).

An ALJ's credibility determination will not be overturned unless patently wrong. *Zurawski*, 245 F.3d at 887 (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)); *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) (citing *Pope v. Shalala*, 998 F.2d 473, 478 (7th Cir. 1993)). It is not "patently wrong" for an ALJ to cite inconsistent testimony between the degree of pain that the claimant reports and that suggested by the medical evidence in his credibility determination. *Powers v. Apfel*, 207 F.3d 431, 435-36; *see also, Knight v. Chater*, 55 F.3d 309, 314 ("An ALJ may discount subjective complaints of pain that are inconsistent with the evidence *as a whole*.") (emphasis added).

Mr. Nitz maintains that the ALJ's decision "fails to consider the overwhelming weight of SSR 96-7p evidence" (Pl. Mem. at 11). It is true that, in determining an RFC, an ALJ cannot ignore the evidence that does not favor his conclusion. *See generally Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (ALJ cannot refer only to evidence favoring the ultimate conclusion to deny benefits; therefore, case remanded); *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) (an ALJ cannot ignore entire lines of evidence that are contrary to the findings). Here, the

ALJ did not do so. To the contrary, in discussing credibility, the ALJ did not cite to additional evidence that wold lend support to his credibility decision.

*First*, when being questioned about his past work, Mr. Nitz testified that it was his absences that caused him to lose work, but that he did not tell his employers that the absences were due to the migraines (R. 237). *Second*, the fact that Mr. Nitz was able to hold jobs up to 1995 is a factor relevant to the credibility of his claim to have suffered from intense migraines since his surgery at the age of six. *Third*, there is the fact that Mr. Nitz sought benefits in 1995 based on his visual impairments – but did not mention any impairment or limitation based on migraines. *Fourth*, the timing of his first complaint about headaches is suspicious. The record reveals that the first time Mr. Nitz made any documented medical complaints about headaches was in April 1997 – one month after he filed his present application. *Fifth*, no family member or other witness came forward at the hearing to confirm, on oath, Mr. Nitz's testimony as to the nature and extent of his headaches.

An ALJ is not required to sift through every piece of evidence presented, so long as he provides ample reasoning in order to discern how a particular conclusion was reached. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996); *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1998). The fact that the ALJ did not cite every piece of evidence supporting his conclusion does not change the fact that his conclusion finds ample support in the record. *See Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) ("it is generally understood that a reviewing court does not reconsider credibility determinations made by the ALJ so long as they find some support in the record").

## C.

A claimant is allowed to submit to the Appeals Council in support of his disability application evidence that was not presented to the ALJ, provided that it is new and material. *Eads v. Secretary of the Department of Health and Human Services*, 983 F.2d 815, 816-17 (7th Cir. 1993) (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)). Mr. Nitz contends that new evidence he submitted, which included a diagnosis of Meniere's disease, "would cast Mr. Nitz's existing symptoms in a new light" (Pl. Mem. at 12). At the threshold, since the Appeals Council considered this new evidence, its discretionary decision that the evidence did not warrant further action is not reviewable. *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). But, even were it otherwise, Mr. Nitz's reliance on this new evidence would be unavailing for two reasons.

*First*, it is unclear whether there was a true diagnosis of Meniere's disease. The "diagnosis" of Meniere's disease that Mr. Nitz cites is found on one page of progress notes, without an explanation of the medical evidence or evaluation that would support such a diagnosis. Nor do the notes identify the extent of any nerve deafness or tinnitus (ringing in the ears) that might be associated with Meniere's disease. Indeed, it is unclear from the cryptic medical notes whether the use of the word is truly a new diagnosis, or a shorthand to refer to the vertigo and dizziness that Mr. Nitz long had experienced.

*Second*, accepting that it is a diagnosis, Mr. Nitz has failed to show how that new diagnosis would be *material* to his claim of disability. The conclusory statement that "[t]he Appeals council rejected the diagnosis due to lack of a particular diagnostic without consideration of the full import of the newly diagnosed condition," (Pl. Mem. at 12), is not enough. According to Mosby's Medical, Nursing and Allied Health Dictionary (3rd Ed. 1990) ("Mosby's Dictionary"), "Meniere's disease" is defined as a "chronic disease of the inner ear

19

with recurrent episodes of vertigo, progressive unilateral nerve deafness and tinnitus." The ALJ's RFC determination included Mr. Nitz's complaints of vertigo and established a significant number of jobs in the national economy not requiring work around machinery or heights. Mr. Nitz does not point out how progressive deafness or tinnitus would further limit those job options – and the medical notes do not do so, either. Moreover, the diagnosis of Meniere's disease does not speak to Mr. Nitz's migraine headaches, which according to Mr. Nitz's testimony, are his primary concern with regard to his disability claim (R. 235).

A new diagnosis that encompasses a symptom the ALJ has already addressed (vertigo), that is silent with regard to the claimant's primary reason for his disability claim (the migraines), and has very little supporting evidence from the existing medical evidence is simply not material. *Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir. 1988) ("Evidence is material if there is a reasonable possibility that it would have changed the outcome of the Secretary's determination"); *see also Edwards v. Sullivan*, 983 F.2d 334, 336-37 (7th Cir. 1993) ("where diagnoses are not supported by medically acceptable clinical and laboratory diagnostic techniques, this court need not accord such diagnoses great weight") (quoting *Veal v. Bowen*, 833 F.2d 693, 699 (7th Cir. 1987)). Thus, the diagnosis of Meniere's disease is not new *and* material, as required by the SSA, and therefore is not a basis to overturn the ALJ's final decision.

## CONCLUSION

For the reasons set forth above, the Court grants the Commissioner's motion for summary judgment (doc. # 18) and denies Mr. Nitz's motion for reversal and/or remand (doc #

8) pursuant to Sentence 4, 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter a final

judgment pursuant to Fed.R.Civ.P. 58.  This case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated:  August 14, 2001**